IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMANUEL TRESS, | : | |
| | : | Case No. 2:11-cv-07713-LDD |
| Plaintiff, | : | |
| | : | |
| v. | : | Jury Demand |
| | : | |
| AXA ADVISORS, LLC, and | : | |
| LAWRENCE PASSARETTI | : | |
| | : | |
| Defendants. | : | |
| | : | |

## FIRST AMENDED COMPLAINT

Plaintiff, Dr. Emanuel Tress, by and through his counsel, and pursuant to F.R.C.P. 15, brings this First Amended Complaint against Defendants AXA Advisors, LLC ("AXA") and Lawrence Passaretti ("Passaretti"). Plaintiff alleges, based on personal knowledge and upon information and belief, the following:

## NATURE OF THE ACTION

1.     Plaintiff, a retired dentist, is an investor who relied upon the advice and expertise of his financial advisor to manage his investments, including his retirement funds. However, when Plaintiff's financial advisor, Defendant Lawrence Passaretti, became aware that he had invested Plaintiff's money in an illegal Ponzi scheme, he decided to keep this critical information to himself and even took steps to prevent Plaintiff from discovering the truth about where his money had gone.

2.     Passaretti covered up the illegal scheme in order to protect himself and to continue receiving substantial fees from the income generated by the illegal investment. In

1

other words, Passaretti put his own interests ahead of the interests of his client, in violation of his fiduciary duties.

3.      Had Passaretti informed Plaintiff of the truth about his investment, Plaintiff could have taken steps to protect himself and his money and could have avoided being named as a defendant in a clawback suit when the Ponzi scheme was eventually uncovered.

4.      Because of Passaretti's actions in selfishly looking out for his own interests and deliberately lying to Plaintiff to induce Plaintiff to stay invested in the fraudulent scheme, Plaintiff was named a defendant in the receiver suit and, upon settling, had to pay back income earned from his investments as well as attorneys' fees.

5.      Plaintiff was a dentist, not a financial expert. He trusted Passaretti, his financial advisor for many years, and relied upon his advice and recommendations. Passaretti took advantage of this trust to enrich himself and when the truth came out, his only concern was for his own protection and his own profits.

6.      Passaretti's actions constituted a breach of his fiduciary duties, fraud, negligent and fraudulent misrepresentation, and a breach of Pennsylvania's consumer protection law.

7.      Passaretti, to this date, has suffered no consequences from his dishonest and fraudulent actions.

8.      AXA, the financial services firm that employed Passaretti, knew that Passaretti was lying to his clients and failed to intervene or appropriately supervise Passaretti in any way in order to protect Plaintiff. As such, AXA aided and abetted Passaretti's breach and is culpable in its own capacity for negligently supervising its employee.

9.      In addition, as Passaretti's employer, AXA is vicariously liable for the torts Passaretti committed while working within the scope of his employment.

## PARTIES

10.     Plaintiff, Dr. Emanuel Tress, is a resident of Montgomery County, Pennsylvania.

11.     Defendant AXA Advisors, LLC, is a Delaware corporation with corporate headquarters in New York. AXA is an Investment Advisor registered with the Securities and Exchange Commission. Defendant Passaretti was employed by AXA during the time period relevant to this litigation.

12.     Defendant Lawrence Passaretti is an individual and an investment advisor who worked for AXA during the time period relevant to this litigation. He resides in Suffolk County, New York, and, during the relevant time period, solicited business from Plaintiff in Pennsylvania.

## JURISDICTION

13.     The case was originally filed in state court in Montgomery County. Defendants removed pursuant to 28 U.S.C. §§ 1441(a) and 1332(a). Jurisdiction is proper under the federal statute governing diversity jurisdiction, 28 U.S.C. § 1332(a), because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

## VENUE

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff resides in this district and a substantial part of the acts or omissions giving rise to this action occurred in this district.

## FACTS

### Passaretti was Plaintiff's Long-time Trusted Financial Advisor

15.     Plaintiff hired Passaretti to be his financial advisor in or around 1992.

3

16. At the time, Plaintiff purchased life insurance from Ronald Lorch ("Lorch"), an insurance salesman who worked for AXA Equitable, another company within the AXA group. Lorch introduced Plaintiff to Passaretti and recommended him as a competent financial advisor.

17. Plaintiff agreed to use Passaretti as his financial advisor, and from that point on, Passaretti managed all of Plaintiff's investments, including his personal retirement funds, his pension and his profit-sharing plans.

18. Passaretti, through AXA, sent Plaintiff monthly or quarterly statements detailing his investment activity.

19. In addition, approximately once per year, Passaretti would travel to Montgomery County and meet with Plaintiff and his wife in person, to discuss their investments and to make suggestions about changing or adding investments.

20. Passaretti was compensated for his services by taking a percentage from Plaintiff's investments.

21. Plaintiff and his wife, who were not experienced in investment or general financial analysis, trusted Passaretti and relied upon his advice.

22. Plaintiff does not recall that he ever declined to follow Passaretti's advice regarding his investments and retirement accounts.

**Passaretti Invests Plaintiff's Monies in the Gemini Fund**

23. In or about late 1996 or early 1997, Passaretti introduced Plaintiff to an investment vehicle called the Gemini Fund and advised Plaintiff to invest in that fund.

24. The Gemini Fund ("Gemini" or "the Fund") was set up and run by Edward T. Stein ("Stein") who had also worked for AXA and was a close friend and professional colleague of Passaretti's.

4

25.     Plaintiff, as usual, relied upon Passaretti's advice and authorized Passaretti to invest $250,000 of Plaintiff's funds into Gemini.

26.     Passaretti sent any required paperwork to Plaintiff for his signature. All of the information Plaintiff received concerning the Gemini Fund came directly from Passaretti.

27.     Plaintiff never met with Stein and never communicated with him in any way. In fact, Plaintiff does not recall ever hearing the name Ed Stein until many years later, after he had removed his funds from Gemini.

28.     From Plaintiff's perspective, Gemini was simply another investment vehicle that his financial advisor, Passaretti, had recommended. As was his usual practice, Plaintiff relied upon Passaretti's advice in investment matters and authorized the investment in Gemini based solely on Passaretti's recommendation.

29.     On or about January 31, 1997, Passaretti invested $250,000 of Plaintiff's funds into the Gemini Fund on behalf of Plaintiff.

30.     AXA, as Passaretti's employer, fully approved of Passaretti promoting the Gemini Fund and directing his clients' investments into the Gemini Fund.

31.     Passaretti, in addition to his fund-based compensation from his clients, also received compensation directly from Stein for the clients that he directed to the Gemini Fund.

32.     Lorch, the insurance agent at Equitable who had introduced Plaintiff to Passaretti, was also aware of the Gemini Fund and that Passaretti was heavily promoting it.

### Passaretti Knew that the Gemini Fund was an Illegal Scam and Actively Concealed the Truth from Plaintiff

33.     In 2009, when FINRA was conducting an inquiry into Passaretti and AXA, it sent Lorch a request for information. Lorch responded in a letter dated October 9, 2009 (attached hereto as Exhibit A), and relayed to FINRA the following information:

5

34.     Sometime in the 1990s, Passaretti first told Lorch about an associate of his named Ed Stein, who had an investment that Passaretti was interested in.

35.     Lorch and Passaretti met with Stein to discuss the investment, which was called the Gemini Fund, L.L.P.

36.     Passaretti told Lorch that AXA's senior management had given their explicit consent and support for Passaretti to place clients into Stein's investment.

37.     Lorch, who focused on insurance sales, had several insurance clients who were steered into investing in the Gemini fund by Passaretti.  Plaintiff was one of these clients.

38.     Lorch received a one-time fee of $200,000 from these investments.

39.     Passaretti also received compensation directly from Stein for bringing clients to the Gemini Fund.

40.     In or around 2003, Passaretti came to Lorch and admitted that he knew that the Gemini Fund was a scam.

41.     Lorch does not indicate if Passaretti ever explained how or when he came into this knowledge, but it is clear that Passaretti admitted to knowing the true nature of the Gemini Fund at this time.

42.     Despite this knowledge, Passaretti did not take any action to protect his clients who had invested in the fund.

43.     Instead, Passaretti actively lied to clients about the Fund and prepared and distributed false monitoring reports to clients.

44.     Passaretti continued to send Plaintiff periodic statements concerning his investments and to meet with him annually to discuss his investment strategy, but never once, either in the statements or in their face-to-face meetings, did Passaretti ever indicate to Plaintiff

6

that there was anything amiss with the Gemini investment.  Nor did Passaretti ever advise
Plaintiff to transfer his funds out of Gemini.

45.     Through his deliberate silence on the issue, Passaretti knowingly and purposely
communicated to Plaintiff that Gemini was a sound investment.

46.     Plaintiff did not know of Lorch's letter to FINRA at the time it was written.  In
fact, Plaintiff did not learn of the existence of the letter and Lorch's allegations against Passaretti
until after he was named as a defendant in the Receiver Action.

**Passaretti's Deliberate Efforts to Conceal Gemini's Illegality Harmed Plaintiff**

47.     Had Passaretti informed his clients, including Plaintiff, that the Gemini Fund was
an illegal scam, when he first learned this information, Plaintiff would have taken steps to protect
himself and his investment, including immediately closing his account with Gemini and
withdrawing those funds.

48.     Had Plaintiff been given timely information by Passaretti and/or AXA, he not
only could have protected himself against liability from being associated with Gemini, but he
also could have invested his funds in legitimate investment vehicles.

49.     Instead, Passaretti kept the information to himself, actively misled his clients, and,
as a result, Plaintiff's involvement in the Gemini Fund continued for another four years.

50.     Plaintiff relied on Passaretti, as his financial advisor, to advise him on his
investments.  This had been Passaretti's practice for many years in his annual meetings with
Plaintiff.

51.     Because Passaretti had introduced Plaintiff to the Gemini Fund and recommended it for investment, Plaintiff relied on Passaretti to keep him informed of any development regarding that investment that would affect Plaintiff.

52.     Plaintiff had a reasonable expectation that Passaretti would be honest and forthright with knowledge he had concerning Plaintiff's investments, and would not lie about or cover-up any improprieties associated with Plaintiff's investments.

53.     Passaretti knew that his clients, including Plaintiff, relied on him for investment advice and trusted him to look after their investments. That is the very role that Passaretti was obliged to take on as Plaintiff's financial advisor.

54.     Passaretti failed to transmit to Plaintiff very relevant and important information about the Gemini Fund, and instead, through his deliberate silence, led Plaintiff to believe that Gemini was a good investment. Passaretti intended for Plaintiff to rely upon his authority and expertise as a financial advisor and intended, through his silence, to keep Plaintiff's funds invested in Gemini.

55.     Plaintiff did, in fact, rely on Passaretti's opinion that Gemini was a sound investment – an opinion Passaretti continued to communicate to Plaintiff despite knowing it was false – in opting to keep his funds invested in Gemini.

56.     Sometime in 2006, Plaintiff decided to switch financial advisors and transferred his business from Passaretti to another AXA advisor, Steve Novick.

57.     At this time, Plaintiff had no reason to question the soundness or legality of his investments with Passaretti. His decision to switch advisors was not based on any known misconduct on Passaretti's part.

8

58.     After Plaintiff switched financial advisors, his new advisor, Novick, reviewed Plaintiff's investments and advised Plaintiff to take his funds out of Gemini.

59.     According to Plaintiff, Novick did not state at the time that there were any improprieties with Gemini, but simply advised him on the basis that Novick did not know much about the Fund and was therefore not comfortable investing in it.

60.     Plaintiff took Novick's advice and, on or about November 2006, directed AXA to liquidate his holdings in Gemini and transfer the funds into his IRA account with Fiserv.

61.     Despite repeated requests by Plaintiff, the closing of his Gemini account was not completed until eleven months later. As detailed below, AXA's management refused to assist Plaintiff in getting his funds out of Gemini, falsely claiming that Plaintiff had invested his funds directly with Stein and that AXA had no involvement.

62.     In addition, in his efforts to get rid of his Gemini investment, Plaintiff also contacted his former advisor Passaretti multiple times to request information and assistance in closing the account.

63.     Passaretti did not respond to Plaintiff's inquiries, thereby hindering Plaintiff's efforts to get his money out of Gemini.

64.     On October 11, 2007, Plaintiff's Gemini account was finally liquidated and the remaining funds were transferred to an IRA account.

65.     In total, Plaintiff withdrew $523,000 from the Gemini Fund, which constituted a net profit of $273,000 from his initial investment. Of those withdrawals, the vast majority -- $233,000 – took place between 2004 and 2007.

**AXA Knew the Truth About Gemini and About Passaretti's Actions, and Took Steps to Protect Itself and Passaretti at Plaintiff's Expense**

66.     Sometime in 2003 or shortly thereafter, AXA's management became aware through notification by other employees that that the Gemini Fund was an illegal scam.

67.     AXA's management was also made aware at this time of Passaretti's improper conduct, including that he knowingly and purposely deceived his clients who had invested in Gemini and kept the truth about Gemini hidden from them.

68.     Passaretti, however, was one of AXA's stars – a top investment advisor who had garnered significant earnings for the company. Therefore, AXA opted to protect Passaretti by refusing to look into the allegations made about Gemini and Passaretti.

69.     AXA not only knowingly sanctioned Passaretti's conduct by refusing to put a stop to it after learning the truth, it also covered for Passaretti by deliberately lying to its clients, including Plaintiff, about Passaretti's and AXA's involvement in Gemini.

70.     Instead of helping Plaintiff get his funds out of Gemini, AXA management insisted to Plaintiff that he had invested directly with Stein and that neither AXA nor Passaretti had any documents concerning his investment with Gemini.

71.     This was false, as Plaintiff had never met Stein, had never communicated with Stein, and had invested in Gemini solely through Passaretti, the same as he had for all of his other investments.

72.     AXA management had been well aware for several years that Gemini was an illegal scam, and its willingness to lie to Plaintiff in an effort to distance itself from any complicity indicated that its concern was solely to protect itself and Passaretti without any concern for its clients.

**Stein's Illegal Scheme is Uncovered, and Plaintiff is Named as a
Defendant in a Federal Lawsuit**

73.     On March 31, 2009, the United States filed a criminal case against Stein, charging
him with securities fraud and wire fraud. Stein pled guilty and is currently serving a lengthy
sentience.

74.     On that same date, the United States Securities and Exchange Commission filed a
civil complaint against Stein, Gemini, and other entities owned and/or controlled by Stein,
alleging violations of federal securities laws. Specifically, it was alleged that Stein ran Gemini
as an illegal Ponzi scheme for two decades that took in roughly $55 million from duped
investors.

75.     At the SEC's request, on April 14, 2009, the court entered an order appointing a
Receiver for the assets of Stein. The Receiver was charged with recovering excess distributions
made to investors during a six-year period beginning on August 31, 2003.

76.     Plaintiff, as an investor who made a profit from Gemini, was named as a
defendant in an amended complaint filed by the court-appointed Receiver to recover the assets of
Stein and the Stein-controlled entities, including Gemini ("The Receiver Action"). The amended
complaint in the Receiver Action was filed in United States District Court for the Southern
District of New York on December 17, 2009.

77.     The Amended Complaint alleged causes of action against Plaintiff and other
defendants for (1) fraudulent transfers under various sections of the New York Debtor and
Creditor Law; (2) conversion; (3) unjust enrichment; (4) constructive trust; (5) and accounting.

78.     Prior to Stein's arrest and the civil complaint, Plaintiff had no idea that Gemini
was an illegal Ponzi scheme, nor could he have known or reasonably discovered this information
on his own.

79.     Prior to being named as a defendant in the receiver action, Plaintiff had not suffered any damages due to his involvement with Stein's Gemini Fund and had no idea that he would be implicated in any way in Stein's illegal actions.

80.     Plaintiff had profited from his unknowing involvement in Stein's Ponzi scheme, which was why he was named as a Defendant.

81.     As such, Plaintiff could not have filed the instant suit prior to being named as a defendant in the Receiver Action since he had suffered no injury and thus had no claims.

82.     Plaintiff eventually negotiated a settlement in the Receiver Action in which Plaintiff paid out $170,000.00 as well as attorneys' fees.

83.     Plaintiff, through no fault of his own, was required to expend time and money in defending the suit and likely would have been found liable had he not settled.

84.     Plaintiff opted to settle the complaint against him in order to avoid a finding of liability.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTIES
### (Against Defendant Passaretti)

85.     Plaintiff hereby incorporates the preceding paragraphs as if they were stated in full.

86.     Defendant Passaretti served as Plaintiff's financial advisor, and as such, owed to Plaintiff the fiduciary duties of loyalty, care, and good faith and fair dealing.

87.     Passaretti breached his fiduciary duties to Plaintiff by intentionally failing to act in good faith and solely for the benefit of Plaintiff.  Specifically, Passaretti:

12

    a.  intentionally withheld relevant and critical information from Plaintiff that would have enabled Plaintiff to protect his investments and avoid any complicity in an illegal scheme;

    b.  withheld critical information from Plaintiff regarding the illegality of the Gemini Fund so that Passaretti could continue to earn compensation from the Fund;

    c.  took active steps to conceal the true nature of the Fund, including sending false reports; and,

    d.  when pressed by Plaintiff to assist him in closing his Gemini Fund, refused to acknowledge his participation in any way, seeking to protect his own interests above the interests of his client.

88.    As Plaintiff's financial advisor, Passaretti was entrusted with a substantial amount of Plaintiff's assets to be invested for the benefit of Plaintiff. Instead, Passaretti intentionally harmed Plaintiff by withholding knowledge of the true nature of the investments that Passaretti had recommended to Plaintiff, in order to benefit himself.

89.    Passaretti's actions were egregious and intentional. He admitted to his colleague Ron Lorch that he knew the Gemini Fund was a scam. He took no steps to protect his client's assets, and instead intentionally participated in perpetuating and covering up the scam. Passaretti consulted an attorney to protect himself, while hanging his clients out to dry.

90.    Plaintiff was injured by Passaretti's breach of fiduciary duties: he suffered the humiliation of being named a defendant in a federal lawsuit; had to expend time and money in defending himself, and ultimately paid out a settlement of $170,000 in the Receiver Action.

91.     Passaretti's breach was a real factor in causing Plaintiff's injury: had Passaretti performed his obligations as a fiduciary and alerted Plaintiff to the fact that Gemini Fund was a scam in 2003 when Passaretti had such knowledge, Plaintiff would have withdrawn all of his funds from Gemini and thus avoided being named as a defendant in the receiver action, which only covered transactions in Gemini made after August 31, 2003.

92.     Therefore, Plaintiff would not have been a defendant in the receiver action but for Passaretti's breach of his fiduciary duty.

93.     Due to Passaretti's breach of his fiduciary duties, Plaintiff was unable to discover the true nature of the Gemini Fund and as a result remained invested in the Fund until 2007.

94.     Had Passaretti alerted Plaintiff in 2003, Plaintiff could have disgorged his funds from Gemini and invested them in legal investments, thereby netting significant gains in the strong market from 2003 through 2007, and avoiding implication in a federal lawsuit.

95.     Plaintiff was further damaged in that the funds that were invested in Stein's Gemini Fund netted him significantly less returns than the average market returns for 2003 through 2007.

96.     Plaintiff demands judgment in his favor and compensatory and punitive damages commensurate with Passaretti's actions.

### COUNT II
### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
### (Against Defendant AXA)

97.     Plaintiff hereby incorporates the preceding paragraphs as if they were stated in full.

14

98. As stated above, Passaretti, as Plaintiff's financial advisor, owed a fiduciary duty to Plaintiff, and breached that duty by withholding critical information from Plaintiff and failing to take any action to protect Plaintiff's assets.

99. AXA knew that the Gemini Fund was an illegal Ponzi scheme and furthermore had knowledge that Passaretti was not performing his fiduciary duties to his client.

100. Despite this knowledge, AXA failed to properly oversee its employee, Passaretti, and intentionally looked the other way as Passaretti kept Plaintiff and other investors in the dark about Gemini.

101. When Plaintiff sought the assistance of AXA's management in closing his Gemini account, AXA lied to Plaintiff about the firm's participation in steering clients into Gemini, and actively denied that Passaretti had invested Plaintiff's money into Gemini. AXA therefore chose to cover for itself and Passaretti at the expense of its clients.

102. AXA aided and abetted Passaretti in his breaches of fiduciary duty towards Plaintiff by:

    a. Failing to alert Plaintiff, its longstanding client, of the true nature of the Fund;

    b. Actively permitting Passaretti to continue deceiving Plaintiff about the true nature of the fund; and

    c. Covering up for Passaretti and refusing to assist Plaintiff in his efforts to get his money out of Gemini.

103. AXA, as Passaretti's employer, had knowledge of his transgressions and was in a position to stop them. It did not, preferring to protect itself and Passaretti at the expense of its clients.

15

104.     Plaintiff demands judgment in his favor and compensatory and punitive damages commensurate with AXA's actions.

## COUNT III
### BREACH OF EXPRESS CONTRACT
### (Against Defendants Passaretti and AXA)

105.     Plaintiff hereby incorporates the preceding paragraphs as if they were stated in full.

106.     Upon information and belief, Plaintiff entered into a contractual relationship with Passaretti and AXA in which Passaretti earned fees from Plaintiff's investments in exchange for his financial advising and investment services. Any documents indicating an express contractual relationship are in the exclusive control and possession of Defendants.

107.     Under this contractual relationship, Defendants received fees from Plaintiff's account as compensation for their services.

108.     Defendants' obligations under the contractual relationship were to competently manage Plaintiff's investments, including an obligation to perform due diligence on investment funds and vehicles in which they invested Plaintiff's money.

109.     Defendants' obligations under the contractual relationship also included taking any necessary steps to protect their clients' assets, including removing clients' assets from any investment fund which Defendants knew to be illegal.

110.     Defendants breached their contractual obligations by, upon learning the true nature of Stein enterprise, failing to alert Plaintiff and take prompt steps to protect Plaintiff's assets.

111.     Plaintiff is entitled to damages from Defendants' breaches of their contractual obligations to Plaintiff, including the return of all fees Defendants earned from Plaintiff during

16

the time that Plaintiff's funds were invested in Gemini, from 2003 through 2007, as well as compensatory and punitive damages commensurate with Defendants' contractual breaches.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (Against Defendants Passaretti and AXA)

112.    Plaintiff hereby incorporates the preceding paragraphs as if they were stated in full.

113.    Upon information and belief, Plaintiff and Defendants entered into an implied contractual relationship in which Defendants earned fees from Passaretti in exchange for their financial advising and investment services. This implied contract is demonstrated by Plaintiff's acceptance of Defendants' fee requirements in exchange for sound and competent financial and investment advice.

114.    Under this contractual relationship, Defendants received fees from Plaintiff's account as compensation for their services.

115.    Defendants' obligations under the contractual relationship were to competently manage Plaintiff's investments, including an obligation to perform due diligence on investment funds and vehicles in which they invested Plaintiff's money.

116.    Defendants' obligations under the contractual relationship also included taking any necessary steps to protect their clients' assets, including removing clients' assets from any investment fund which Defendants knew to be illegal.

117.    Defendants breached their contractual obligations to Plaintiff by, upon learning the true nature of Stein's enterprise, failing to alert Plaintiff and take prompt steps to protect Plaintiff's assets.

118.    Plaintiff is entitled to damages from Defendants' breaches of their contractual obligations to Plaintiff, including the return of all fees Defendants earned from Plaintiff during the time that Plaintiff's funds were invested in Gemini, from 2003 through 2007, as well as compensatory and punitive damages commensurate with Defendants' contractual breaches.

### COUNT V
### FRAUD
### (Against Defendant Passaretti)

119.    Plaintiff hereby incorporates the preceding paragraphs as if they were stated in full.

120.    Beginning sometime in 2003, Passaretti actively and intentionally misrepresented to Plaintiff the true nature of the Gemini Fund and the fact that it was an illegal Ponzi scheme. Passaretti admitted to his colleague that he knew Gemini Fund was a scam, and actively kept that information from his clients who were invested in the Fund.

121.    Passaretti regularly communicated with Plaintiff via periodic statements and annual meetings in person, but at all times during these communications deliberately withheld his knowledge of the illegality of the Gemini Fund. As such, Passaretti purposely misrepresented to Plaintiff, by his deliberate omissions, the truth about Gemini.

122.    As Plaintiff had a quarter of a million dollars invested, upon Passaretti's advice, into the Gemini Fund, the fact that the Gemini Fund was an illegal Ponzi scheme was a highly relevant and material fact concerning Plaintiff's investment.

123.    Passaretti's intentional misrepresentation was also a material factor in Plaintiff keeping his funds invested in Gemini. Plaintiff had long relied upon Passaretti to manage his investments and advise him on appropriate investments. Plaintiff trusted Passaretti's authority and expertise in investment matters and unfailingly followed his advice concerning investments.

18

124.    Because Passaretti was Plaintiff's financial advisor, he occupied a position of trust and Plaintiff was justified in relying on Passaretti's representations regarding the soundness of his investments.

125.    The Gemini Fund was a scam. Passaretti knew it, and took active steps to keep that information from Plaintiff and his other clients.  Passaretti was paid by Plaintiff to provide investment advice, he knew that Plaintiff relied upon his investment advice; and he kept his knowledge of Gemini a secret with the intent that Plaintiff would keep his monies in Gemini, thereby generating fees for Passaretti.

126.    Plaintiff did, in fact, rely upon Passaretti's material and deliberate misrepresentations and kept his funds invested in Gemini well beyond 2003.

127.    Plaintiff was injured by Passaretti's actions: had Passaretti informed Plaintiff of the true nature of the Gemini Fund when he first became aware of its illegality, Plaintiff could have and would have taken steps to protect himself, including promptly withdrawing all of his funds from Gemini and investing them elsewhere. Plaintiff would have avoided any implication in the federal Receiver Action and would not have had to pay back $170,000 plus attorney's fees.

128.    As such, Passaretti's deliberate and intentional fraud upon Plaintiff was a direct and proximate cause of Plaintiff' injury. Plaintiff would not have been a defendant in the Receiver Action but for Passaretti's fraudulent misrepresentations concerning the Gemini Fund.

129.    Plaintiff demands judgment in his favor and compensatory and punitive damages commensurate with the egregious nature of Passaretti's fraud.

## COUNT VI
## NEGLIGENT AND FRAUDULENT
## MISREPRESENTATION
### (Against Defendant Passaretti)

130.    Plaintiff hereby incorporates the preceding paragraphs as if they were stated in full.

131.    As Plaintiff had a quarter of a million dollars invested, upon Passaretti's advice, into the Gemini Fund, the fact that the Gemini Fund was an illegal Ponzi scheme was a highly relevant and material fact concerning Plaintiff's investment.

132.    Passaretti knew, in or around 2003, that the Gemini Fund was illegal.  He admitted as much to his colleague Ron Lorch.

133.    Passaretti knew that this information was critical to his clients, including Plaintiff, and their abilities to protect their funds.

134.    Passaretti, despite serving as Plaintiff's financial advisor with the responsibility and authority to look after Plaintiff's investments, intentionally withheld this critical information from Plaintiff.

135.    Passaretti knew that Plaintiff relied on, and intended that Plaintiff rely on, his authority and expertise in investment matters.

136.    Plaintiff, relying on Passaretti's representations, through his intentional silence, that all was well with his investments in Gemini, continued to keep his funds invested there.

137.    Plaintiff was injured by Passaretti's intentional and/or negligent misrepresentation concerning Gemini in that, had Plaintiff known in 2003 about the Fund's true nature, he would have promptly divested his funds and invested them elsewhere, thereby protecting himself against the eventual Receiver Action.

138.    Plaintiff would not have been a defendant in the Receiver Action but for

Passaretti's intentional misrepresentations about the Gemini Fund.

139.    Plaintiff demands judgment in his favor and compensatory and punitive damages

commensurate with Passaretti's actions.

**COUNT VII**
**NEGLIGENT SUPERVISION**
**(Against Defendant AXA)**

140.    Plaintiff hereby incorporates the preceding paragraphs as if they were stated in

full.

141.    Passaretti, during the relevant time period, was employed by AXA.

142.    As Passaretti's employer, AXA had a duty to supervise Passaretti's conduct as a

financial advisor.

143.    By sanctioning Passaretti's conduct and allowing it to continue, even after it came

to the attention of AXA management that the Gemini Fund was an illegal scam, AXA failed in

its duty to exercise reasonable and ordinary care to prevent Passaretti from harming his innocent

clients.

144.    Passaretti committed his torts against Plaintiff, including breaching his fiduciary

duties, and making fraudulent misrepresentations, while working on AXA's premises and as an

employee of AXA.

145.    AXA not only permitted Passaretti to continue in his illegal actions, but also took

steps to cover up for Passaretti by denying that he had any involvement in investing his clients'

funds in Gemini.

146.    Plaintiff was harmed by AXA's failure to supervise Passaretti. Plaintiff, as a

client of AXA's, relied on the company to protect his investments. Had AXA supervised

21

Passaretti as it should have and put an immediate stop to his illegal and unethical conduct,

Plaintiff would not have been injured by being implicated in the Receiver Action.

147.     Plaintiff demands judgment in his favor and compensatory and punitive damages commensurate with AXA's actions.

**COUNT VIII**
**VIOLATION OF PENNSYLVANIA'S**
**UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW,**
**73 Pa. C.S. § 201-1 et seq.**
**(Against Defendants Passaretti and AXA)**

148.     Plaintiff hereby incorporates the preceding paragraphs as if they were stated in full.

149.     At all relevant times, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S. § 201-1 et seq. ("UTPCPL"), was in effect and applicable to the financial services at issue in this case.

150.     Plaintiff purchased financial and investment services from Passaretti and AXA primarily for personal, family or household purposes within the meaning of 73 Pa. C.S. § 201-9.2. Specifically, Plaintiff used Passaretti's and AXA's investment advice to help him save funds for retirement.

151.     Defendants use or employed unfair and/or deceptive acts or practices within the meaning of 73 Pa. C.S. §§ 201-2 and 201-3.  Specifically, as stated herein:

> a.  Passaretti committed fraud against Plaintiff by purposefully and intentionally withholding from Plaintiff critical and relevant information concerning the legality of one of his investment vehicles – the Gemini Fund, with the intention that Plaintiff would rely on Passaretti's support for the investment in keeping his money in Gemini;

22

b. Passaretti committed fraud against Plaintiff by actively concealing the illegal nature of the Gemini Fund, with the intent to keep the Fund's true illegal nature hidden from Plaintiff;

c. AXA willingly and knowingly participated in Passaretti's actions to keep the illegal nature of the Fund a secret to its investors, with the intent that AXA investors would keep their money in Gemini.

d. AXA purposely lied to Plaintiff about any role that it or Passaretti played in investing Plaintiff's funds in Gemini in order to prevent Plaintiff from uncovering the truth about the illegal scheme and to shield itself from liability.

152.    Through these deliberate acts and omissions, Passaretti and AXA engaged in fraudulent and deceptive conduct that created a likelihood of confusion and misunderstanding in violation of 73 Pa. C.S. § 201-2(4)(xxi).

153.    Passaretti and AXA knew that Plaintiff would rely on their conduct and intended Plaintiff to rely on their conduct so that Plaintiff would keep his funds in Gemini.

154.    Plaintiff, did in fact, rely on Passaretti's and AXA's assurances, through their deliberate silence and withholding of critical information, that Gemini was a sound investment and kept his monies in Gemini far longer than he would have had Defendants promptly told Plaintiff the truth.

155.    Plaintiff was damaged by Passaretti's and AXA's violations of the UTPCPL in that Plaintiff was named as a defendant in the federal Receiver Action and ultimately had to pay out $170,000 plus attorneys' fees to settle that litigation against him.

156.    Passaretti's and AXA's conduct were proximate causes of Plaintiff's injury: had Passaretti and/or AXA alerted Plaintiff to the truth about the Gemini Fund in 2003, Plaintiff

would have withdrawn all monies from the Fund and would not have been implicated in the

Receiver Action, since that action only governed Gemini Fund activity beginning in August

2003.

157.   Therefore, without Passaretti's and AXA's statutory violations, Plaintiff would

not have been damaged.

158.   Passaretti's fraudulent actions and AXA's support for Passaretti's fraudulent

actions and its attempts to cover for Passaretti constitute willful and deliberate violations of the

UTPCPL.

159.   Plaintiff demands judgment in his favor as well as all statutory damages available

including $100 per violation, treble damages, and reasonable attorneys' fees and costs under

UTPCPL, 73 Pa. C.S. § 201-9.2.

## COUNT IX
## VICARIOUS LIABILITY
### (Against Defendant AXA)

160.   Plaintiff hereby incorporates the preceding paragraphs as if they were stated in

full.

161.   At all times relevant to this litigation, Passaretti was acting within the scope of his

employment at AXA.

162.   Passaretti was employed by AXA as a financial advisor working in investment-

related services.  This is exactly the function that Passaretti was performing when he committed

his torts against Plaintiff.

163.   As Passaretti's employer, AXA is vicariously liable to Plaintiff for the torts

committed by Passaretti.

164.   Alternately, Passaretti functioned as AXA's agent, with the express authority to provide investment services on behalf of AXA.

165.   Since Passaretti functioned as AXA's agent, AXA is vicariously liable to Plaintiff for the torts committed by Passaretti while acting within the scope of his agency.

166.   Plaintiff demands judgment in his favor and against AXA on the basis of AXA's vicarious liability for Passaretti's torts.

## COUNT X
## INDEMNIFICATION
### (Against Defendants Passaretti and AXA)

167.   Plaintiff hereby incorporates the preceding paragraphs as if they were stated in full.

168.   Plaintiff, by virtue of being named as a defendant in the Receiver Action, was implicated as being liable to Stein's victims for their losses.

169.   Plaintiff, because he had profited from his investment in Gemini, would likely have been found liable to Stein's victims through the Receiver Action.

170.   Plaintiff opted to settle the claims against him to avoid a lengthy and costly trial and a likely finding of liability.

171.   Plaintiff was made liable to Stein's victims through no active fault of his own, but solely by virtue of being one of the investors who made a profit from Gemini.

172.   Plaintiff's liability to Stein's victims was solely the result of a legal obligation, and was not the result of any culpable conduct on Plaintiff's part.

173.   Passaretti, on the other hand, acted in a way that not only harmed Plaintiff, but also harmed Stein's victims.  Passaretti knew in 2003 that the Gemini Fund was an illegal Ponzi

25

scheme. Had he alerted proper authorities, Stein's scam would have been uncovered much earlier and many of Stein's victims would have been spared.

174. AXA, by also failing to alert authorities to the truth about Stein's Fund, also contributed to the harm visited on Stein's victims.

175. As such, Passaretti's and AXA's liability to Stein's victims is based on actual culpable conduct.

176. Moreover, Plaintiff would not have been liable to Stein's victims at all had Defendants not breached their duties and committed various acts of fraud and misrepresentation.

177. It is thus fundamentally unfair that Passaretti and AXA, who committed egregious and deliberate wrongful acts that harmed not only Plaintiff but also Stein's victims, should avoid any liability while Plaintiff, who did nothing wrong, should be made to pay.

178. Wherefore, Plaintiff demands that Defendants indemnify him against the damages he had to pay out in order to settle the Receiver Action.

## JURY DEMAND

179. Plaintiff demands trial by jury on all counts for which jury trial is permitted.

## PRAYER FOR RELIEF

Plaintiff hereby demands judgment in his favor and against Defendants on all counts, and requests the following relief:

a.  Compensatory damages in an amount determined by a jury for Defendants' breach of their fiduciary duties, fraud, intentional and negligent misrepresentation, and negligent supervision;

26

b.    A declaration that Defendants breached their contract, and an order requiring Defendants to return all fees collected from Plaintiff between 2003 and the present;

c.    Treble damages as permitted under the UTPCPL;

d.    Punitive damages as allowed in an amount sufficient to deter future conduct by Defendants;

e.    Indemnification of the amount Plaintiff paid to settle the Receiver Action, in addition to attorneys costs and fees paid out in connection with that matter;

f.    An award of attorney's fees and costs to bring this action as permitted by the UTPCPL; and

g.    All other relief deemed appropriate.

DATE:  February 9, 2012               TRUJILLO RODRIGUEZ & RICHARDS, LLC

                                      By: _____
                                      Kenneth I. Trujillo (Atty. ID No. 46520)
                                      Jennifer Agnew (Atty. ID No. 206673)
                                      1717 Arch Street, Suite 3838
                                      Philadelphia, PA  19103
                                      Phone: (215) 731-9004
                                      Fax:  (215) 731-9044
                                      Email:  jagnew@trrlaw.com

                                      *Attorneys for Plaintiff Emanuel Tress*

# EXHIBIT A

Ronald J. Lorch
1445 Rydal Road.
Rydal, Pa 19046

October 9, 2009

Mr. Robert Bayer
Two Jericho Plaza
2nd Floor
Jericho, NY 11753

Re:    Examination No. 2009 017 5291/AXA Advisors LLC/Lawrence Passaretti

Dear Mr. Bayer,

In accordance with FINRA'S 8210 request, enclosed is my response to the above referenced inquiry into AXA Advisors ("AXA") and Lawrence (Larry) Passaretti. I hope that my response gives FINRA insight into what was happening at AXA and more specifically, how they were aware of Mr. Passaretti's actions but looked the other way, to the detriment of my family and myself.

I was introduced by AXA's then-senior management to Larry over twenty years ago, while attending an AXA/Equitable function. Management's idea was for us to leverage off each other's expertise and to cross sell our existing books. Larry was billed as "The Securities Specialist" at AXA/Equitable, while I was an established Life Insurance Salesman.

Larry was granted access to my clients and began doing business on the securities side. Larry was responsonsible for handling all securities paperwork, managing the accounts and maintenance of all client files. I was never provided any information as it pertained to these clients, and even if I was, I am not qualified to understand it. I was not properly educated or licensed, nor did I possess the knowledge or desire to sell securities. These were Larry's responsibilities, which were very well defined, and everyone understood their roles.

In the late 80's, Larry encouraged me to invest in a European auto manufacturer, which he claimed was a "Sure Thing". Having no reason at this time to doubt Larry, I invested in what turned out to be an absolute nightmare. I lost my entire $100,000.00 investment and put the onus on Larry to get me my money back. After several years and a tremendous amount of needling from me, Larry made me whole on this failed investment. When questioned how this was suddenly possible, Larry explained that Ed Stein, who I had never met took care of it. When I asked why Ed Stein would do this, Larry would not elaborate and told me that I should be grateful.

Larry then said Ed Stein had an investment that he would like to introduce to us. Larry did not elaborate on the investment, however, Larry told me on numerous occasions that he had the consent and support of Senior Management at AXA to place clients into this investment. Thereafter, Larry and I met with Ed Stein to discuss the investment. Not

having the knowledge or sophistications to understand the investment I did not feel comfortable advising anyone to invest in this type of venture. However, this did not stop Larry, who jumped right into bed with Ed Stein and began raising money's for Gemini Fund I, L.P. a limited partnership.

I want to make sure the record is clear as to how these transactions were accomplished. Larry, with the understanding and support of AXA/Equitable, solicited, sold and received compensation for the sales of the Gemini Fund to many of the clients, including but not limited to, Bruce Toll, Alan Berg, Barbara Berg, Matt Canno, Emanuel Tress, Al Holbert, Phil Uchitel and several others. Even though I never made any of these transactions, I received a one time fee from Ed Stein for the money that Larry raised in Gemini in the amount of $200,000.00. It is my belief that Larry received significantly more monies since he sold Gemini to other of his clients. Larry had confirmed with me that he had received his portion of compensation directly from Mr. Stein.

Roughly six years ago, a very distraught Larry Passaretti contacted me and informed me that the investment that he solicited and placed clients into with Ed Stein's Gemini Fund was a scam. At the direction of Larry, and at Ed Stein's expense, we both consulted separate attorneys. Larry worked with Steven Cohen, Esq. currently of the NY Attorney General's office, while Mark Mandel, Esq. currently with Schulte Roth, represented me.

Notwithstanding the foregoing, Larry continued to keep up this charade by continuing to lie to clients about their investments and actually went as far as preparing and distributing false monitoring reports to the clients.

Larry Passaretti's actions have also taken a toll on my personal life. My son-in-law Mr. Steven Novick has also been affected by Mr. Passarretti's action and in kind so have I. Mr. Novick became affiliated with AXA in late 2002, and since he was a large producer, he was advanced money to assist in his transition from his former firm. In order for AXA to advance Mr. Novick this money, AXA required me to collateralize this loan by putting up my residual income from my business if Steven defaulted. I was happy to do this since Steven was coming to AXA knowing that I was nearing retirement and that I would transition my entire business over to him. I have had a close relationship with my clients and felt strongly about having my family continue to service them.

In February of 2003, three months into Mr. Novick's tenure at AXA, Mr. Novick, along with senior-level management discovered that Larry had surreptitiously moved my accounts out of the joint-rep number that we shared and into Larry's individual rep number. By doing so, Larry was depriving me of income and depriving Steven of accounts which were supposed to transition to him. AXA investigated, even creating spreadsheets to document this diversion, however, nothing was ever done to rectify the situation. This was clearly based upon the fact the Larry was being given favorable treatment by management.

Moreover, in or about 2004, Mr. Novick realized that Larry was committing sales practice violations, by "selling away" limited partnership interests in Gemini I L.P. To

prevent further improprieties by Larry, Steven brought written proof of same to various members of AXA's management and others, including, Bob Jones (President of AXA Distribution Holding Corp.), Ned Dane (President of AXA Advisors), Rich Ferone (compliance officer), Chris Aguele (compliance officer), William DeMatteo (compliance officer), Joe Colombo (VP and Regional Manager), Barry Salzhauer (compensation department) and Mike Rynicker (SROP). Although AXA chose not to discipline Larry for selling away, senior management had disdain for Mr. Novick for reporting on "one of their own." Steven was eventually fired for what we believe to be "whistle blowing" on Larry and the loan was called. This matter is currently being litigated and my assets are now in jeopardy due to Larry's actions and AXA's failure to act on what was brought to their attention.

If you have any additional questions, please do not hesitate to contact me.

Sincerely,

Ronald J. Lorch